### JONES v. EASTHAM.　(No. 7873.)

(Court of Civil Appeals of Texas. Galveston. June 10, 1920. Rehearing Denied June 30, 1920.)

1. **Logs and logging** ⬦3(5) — **Negotiations merged in written contract.**

Impression which owner of standing timber got in negotiations for sale thereof as to what he was to receive therefor cannot avail for rescission of his subsequent written contract of sale, complete in its terms; all prior negotiations and agreements being merged in the written contract.

2. **Contracts** ⬦94(5)—**Only inducing misrepresentation ground for rescission.**

A misrepresentation to be available as ground for rescission of contract must have been an inducement to it.

3. **Logs and logging** ⬦3(5)—**No legal fraud in sale.**

Case as made by owner of standing timber for rescission on ground of misrepresentation of contract of sale *held* not to rest on legal fraud.

Appeal from District Court, Walker County; John S. Prince, Judge.

Suit by Luther Eastham, Jr., against J. B. Jones, Sr., and another to rescind a contract of sale. Judgment for plaintiff, and the named defendant, who asked specific performance of the contract, appeals. Reversed and rendered.

Dean & Humphrey and A. T. McKinney, Jr., all of Huntsville, for appellant.

Gill Jones, Tyler & Potter, and Vinson Elkins & Wood, all of Houston, and W. E. Gates, of Huntsville, for appellee.

GRAVES, J. By written contract of date September 4, 1918, Luther Eastham, Jr., agreed to sell and J. B. Jones, Sr., to buy at the fixed lump sum of $15,000 cash, all the pine and hard wood timber on 14 small tracts of land, each in a different survey, but all lying in Walker county, Tex., and aggregating 5,269 acres. Two thousand dollars earnest money was paid by Jones to Eastham, with provision for payment of the balance of $13,000 as soon as title to the lands was approved by Jones' attorneys, upon complete abstracts to date to be furnished by Eastham. The abstracts were so furnished and approved, and Jones then tendered full performance upon his part, including payment of the remaining $13,000 of the purchase price, but Eastham refused to carry out the contract of sale and brought this suit to rescind, alleging that he had been induced to make it through the fraud of Jones and of his son, J. B. Jones, Jr., both of whom he made parties defendant, under charges that they had entered into a fraudulent conspiracy having as its successful objective the procuring from him of the contract he so sought relief against.

Both defendants entered emphatic denials of every averment or suggestion of fraud made, Jones, Jr., further disclaiming any interest in or connection with the contract, while Jones, Sr., declared upon it as his individual undertaking, full performance of which, including payment of the $15,000 purchase money, he tendered, praying that specific performance in his favor against Eastham be decreed.

Over the protest of the defendants, in the form of motions and objections interposed at successive stages of the trial, the court submitted the cause to a jury upon special issues of fact, and on the return of answers entered judgment in Eastham's favor for rescission of the contract, declaring the same to be null and void. By subsequent order the motion of J. B. Jones, Jr., to set aside the judgment for costs against him was granted.

J. B. Jones, Sr., appeals, contending through a number of assignments that under the undisputed testimony no actionable fraud

---

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

was shown, no legal ground for the nonenforcement of the contract was presented, and that specific performance thereof in his favor should have been ordered. As already stated, by appropriate procedure he had at the several turning points of the trial below pressed the same view there.

The jury's findings upon the issues submitted to them need not be detailed, if upon the developed facts of the whole case the trial court should have seen to it, in response to one or another of several proper requests in due order made for such action, that cancellation be denied and enforcement of the contract directed.

Furthermore, there are no substantial differences in this court between the litigants as to the principles of law involved, their viewpoints diverging solely upon the applicability of well settled and mutually recognized rules to the evidence in its entirety.

The material facts, then, alone afford the solution of this ultimate issue so raised by the appeal. As gleaned by this court from a voluminous record, but yet lifted well above the plane of controversy because found to be undisputed, they are these:

The parties were related, the appellant and his son being, respectively, the brother-in-law and the nephew of the appellee, and at the time of the differences here involved both of them owed him money. Jones, Jr., had previously held two separate written options on this timber, of date January 3, 1917, and January 7, 1918, respectively, under the first of which the appellee had agreed to sell it to him at $20,000, and under the second one at $22,000 in consequence of the addition of further acreage, but he had been unable to dispose of the property, and both options had expired some time before the execution of the contract with Jones, Sr., of September 4, 1918, out of which this cause arose. While the father aided his son in efforts to sell the timber during the life of these options, there is no evidence that he had any beneficial interest in or any other connection with them, nor, in turn, that the son had any such interest in the father's own later contract covering the same property, nor any further connection therewith than is hereinafter stated:

Some time after the two option contracts with J. B. Jones, Jr., had lapsed, and without any previous conversation or understanding of any sort between appellant and the appellee touching the matter of a deal between them for the sale of the timber, appellant, who had gone there from Huntsville that day and was then in Houston, on August 22, 1918, pursuant to a prior talk over the matter of himself selling the timber with his son, J. B. Jones, Jr., who had then requested his father, in event he succeeded, to wire him, sent back to his son at Huntsville this telegram:

"Houston, Texas, 905A August.

"J. B. Jones, Jr., Huntsville, Texas. Big lumber deal off. They say timber badly burnt and nothing on ground and tracts badly scattered. Only way they will buy is on credit pay as they cut. Have found new party and can use Eastham timber with mine at Fifteen Thousand cash. Reasonable check for forfeit on First National Bank Houston. Balance cash soon as abstracts are approved by attorneys. This is last chance I know of if Luther wants to put his in at Fifteen Thousand have him wire me here quick. Be home to-day.                J. B. Jones.    1103 A."

On receiving this message in Huntsville between 3:30 and 4 p. m. the day of its date, J. B. Jones, Jr., showed it to Mr. Eastham, and the latter slightly later the same afternoon sent to Jones, Sr., at Houston this answering telegram:

"Huntsville, Texas, 1143 A. August, 1918.

"J. B. Jones, Sr. Bender Hotel, Houston. Have party to put money up in First National Bank to credit of Luther Eastham, Jr. Will accept fifteen thousand cash.

"Luther Eastham, Jr."

After a quick delivery of that reply to appellant, a long-distance telephone conversation ensued between them, in which an understanding was reached that $2,000 should be put up in the First National Bank of Houston as a forfeit, and that appellant should wire appellee when that had been done. He did so at 5:16 the same afternoon, and the appellee received the advice in Huntsville on the same day; it further reciting that receipts for the money had been left for him at the Bender Hotel in Houston.

As indicated, all these transactions occurred on August 22, 1918, and afterwards, on August 30, the contract of sale appellant had prepared and furnished him covering the timber referred to in the telegrams and telephone conversation was first executed and mailed by the appellee to appellant at Houston, the latter having in the meantime returned there for some purpose. On September 4, after thus receiving it at Houston, appellant took this contract back to Huntsville, and, to quote the appellee's own version of the matter, this further occurrence took place:

"Mr. Jones came up there and said that it would have to be changed. That was on the 4th of September. He would not accept the contract I signed on August 30th. He had the last page changed on the 4th of September. I signed it that way."

So that, in the final form, the contract was not signed by appellee until the thirteenth day after the above-copied initial telegram from J. B. Jones, Sr., of August 22 was exhibited to him. Pursuant to its amended terms, he then caused abstracts of title to be

brought down to date and delivered them to appellant, after having inquired of the latter how much he was getting for the timber and whom he was selling it to, and having been refused the information sought.

Following delivery of the abstracts, appellant had his attorneys examine and report thereon, of which action the appellee was cognizant at the time, and he afterwards undertook to meet and have cured the defects such attorneys pointed out in the titles. This was all done, as stated, subsequent to appellant's refusal to tell who was getting the timber under himself or what was being paid to him for it.

The appellee, when testifying at the trial, repeatedly admitted that appellant himself at no time made any oral statements or representations to him with regard to the purchase of this timber, nor anything further in writing than the quoted telegrams contained, but claimed that the father was particeps criminis with his son, J. B. Jones, Jr., in certain misrepresentations the latter was alleged to have made to the appellee before and at the time he so exhibited to him his father's first telegram offering $15,000 for the timber.

A diligent search of the record, however, fails to disclose any evidence of any such participation or collaboration upon appellant's part; and this result must still, we think, be found to be the state of the proof upon the case as a whole, even after allowance is made for every legitimate inference the otherwise uncontroverted evidence permitted to be drawn from the somewhat uncertain meaning of some of the clauses in this crucial telegram; that is, after both its terms and purport are tested in such light as the statements of J. B. Jones, Jr., to Eastham cast upon it, there is yet no fraud attributable to J. B. Jones, Sr.; this for at least two reasons: First, no statement or representation in the telegram itself was shown to be false or untrue; second, no guilty knowledge of or legal responsibility for such misrepresentations, if any, as the jury were justified in finding J. B. Jones, Jr., had made to Eastham was brought home to appellant.

When testifying categorically on cross-examination as to each successive recitation in the telegram, appellee admitted there was nothing in it or in any clause or phrase of it that deceived or misled him; but since on direct examination his position in substance was that the message as a whole, along with the contemporaneous misrepresentations he charged J. B. Jones, Jr., with having made, did mislead him, it becomes appropriate to first recapitulate what was undisputedly shown about the several matters specified in the message itself, and then to consider the result obtained in the light of Jones, Jr.'s, statements.

As to the telegram: "Big lumber deal off"

had reference to the effort of both father and son to sell the timber for the $22,000 fixed in the second written option appellee had given J. B. Jones, Jr., which they had been wholly unable to do, wherefore the deal was in fact off, and the option itself had lapsed. "They say timber badly burnt and nothing on the ground and tracts badly scattered" was but a repetition of the information the estimators had furnished about the timber, the truth of every word of it being uncontradictedly established by the testimony of the witness J. O. Oliphant. "Only way they will buy is on credit pay as they cut" was an assertion that only buyers of what is called a timber contract—that is, paying as they cut —would purchase this timber. Such were in fact the kind of buyers Jones sold to, and none of the evidence even tended to indicate that they or any one else would have bought this particular timber, situated as and in the condition it was, on any other basis. "Have found new party and can use Eastham timber with mine at $15,000.00 cash"—this statement was shown to mean that Jones, Sr., had found Mr. G. A. Wynne, of Gibbs & Wynne, timber owners and also cashier of Gibbs National Bank of Huntsville, who would advance him the sum of $15,000 cash, and that he could use with his own and would buy the appellee's timber for that price. He himself owned or controlled the timber, on an adjacent tract of 1,920 acres of land in the Seaborn A. Mills survey, and did put that also into his deal with Mr. Wynne. The latter upon the witness stand verified the entire arrangement.

"Reasonable check for forfeit on First National Bank of Houston. Balance cash as soon as abstracts are approved by attorneys." The amount of the forfeit, $2,000, was mutually fixed by telephone agreement, was deposited in the bank named, and the remaining $13,000 tendered, all as hereinbefore appears. "This is last chance I know;" that is, under the testimony developed, the agreement appellant then had with Mr. Wynne, who was to advance him $15,000 with which to make a cash purchase of this timber from Eastham, was averred to be the only chance to sell of which he had knowledge. Not only was no other one shown to be within his knowledge or contemplation, but the unchallenged testimony of both the purchaser, Mr. Wynne, and himself was that Wynne would not advance any more money with which to make the purchase of the Eastham property, although Jones had tried to get him to do so; appellant further swore that at the time he had been advised by experienced timber men that nobody but Gibbs & Wynne could use this particular timber—a view nothing in the record tends to indicate he had any reason for not accepting as correct. "If Luther wants to put his in at $15,000.00 have him wire me here quick," if not in itself suf-

ficiently so, is made quite plain, as is also his correct understanding of it, by appellee when he testified:

"That was putting it up to me to decide if I wanted to sell at fifteen thousand dollars, and if they were ready to carry out the contract. They were always ready to carry out this contract according to this telegram."

And that the actual cash value of this particular timber, situated, circumstanced, and being sold by Eastham in the manner and form it was, did not exceed the $15,000 agreed to be paid for it, was the unanimous verdict of all the witnesses upon that point.

Concerning the representations: Since the jury found the Jones, Jr., statements to have been made substantially as the appellee said they were, what are deemed the most material portions of his testimony about them are here reproduced. He said:

"At the time he procured these contracts (referring to the two above-described options of J. B. Jones, Jr.), the first calling for $20,-000 cash, and the second for $22,000, he represented to me that that was the total amount of cash that the timber was worth, and that that was all that he could procure for it. He represented to me that his father's timber went in this deal and was being sold at the same time. Mine was supposed to be put in. It was all being sold at the same time, and mine was to be put in the same as his. J. B. Jones, Jr., on or about June 30, 1918, did not procure a purchaser for the timber or call upon me to execute any additional papers. He said J. B. Williams, of Houston, was going to buy the timber, but he never did. Mr. J. B. Williams is a timber man of Houston, Tex. He didn't close any purchase, and no other papers were executed by me. That telegram was brought to my office in Huntsville, Tex., by J. B. Jones, Jr. * * *

"When J. B. Jones, Jr., brought me that telegram, J. B. Jones, Sr., was in Houston. J. B. Jones, Jr., was in my office in Huntsville. Houston, Tex., is supposed to be about 75 miles from Huntsville, Tex. It takes about 2½ hours to go by rail from Huntsville, Tex., to Houston, Tex. You change cars in going by rail from Huntsville to Houston, Tex., at Phelps. J. B. Jones, Jr., handed me that telegram from his father, J. B. Jones, Sr., sent from Houston, Tex., to him at Huntsville, Tex., and said that the new party referred to there in the telegram was A. C. Ford of Houston, Tex. He said the $15,000 was a good price, that they had had it estimated, and that it was all that it would bring and all that they could get for it at that time. At that time I was on friendly and cordial relations with J. B. Jones, Jr., and J. B. Jones, Sr. I had every confidence in both of them at that time. J. B. Jones, Jr., was in my office every day of the world, nearly, and his father came there, too. * * * There was a cordial and friendly relationship of trust existing between me and J. B. Jones, Sr., at that time; just as cordial a feeling as there was between my brothers; I had the utmost confidence in both of them. I relied on the statements in that telegram

and the statements made to me by J. B. Jones, Jr., at the time. That induced me to execute this agreement a few days after, of date August 30, 1918. I would not have executed that agreement if I had not relied on the statements made in that telegram and made to me in person by J. B. Jones, Jr., at that time. I believed that at that time they had had the timber estimated, and that Mr. Ford, a practical man, believed on actual estimate that $15,000 was all it was worth, and that they told me the truth. I believed what they said about it, and believed that as the truth, and I acted on it as such. If I had not believed such statement, I would not have entered into the contract of date August 30, 1918."

These matters were reiterated in different forms under extended examinations, but the quotation comprehends all the important fact statements the appellee averred the younger Jones made to him. When analyzed, they get down to three charges:

(1) He was told his timber was being put in with that of Jones, Sr.

(2) That A. C. Ford of Houston was the purchaser.

(3) That they had had it estimated and $15,000 was a good price, all it was worth, and all they could get for it at that time.

Here again, however, there is a complete dearth of evidence of any probative force establishing the falsity of any one of these declarations. What actually took place in the matters to which they have reference was undisputedly proven to be this course of dealings: Gibbs & Wynne, of Huntsville, were blocking up and selling on their own account to A. C. Ford, of the Palmetto Lumber Company of Houston, upon a long-time credit basis at 6 per cent. annual interest—that is, only to be paid for as and when cut, with ten years time within which to remove it—the timber upon a large number of tracts of land in the same general territory in Walker county as that here involved. J. B. Jones, Sr., had been trying to induce them to include in their sale to Ford his own 1,920 acres in the Seaborn Mills survey, and also the Eastham 5,269 acres, at the $22,000 specified in the last option contract his son held thereon. In collaboration Gibbs and Wynne and Ford, in July and August of 1918, and prior to the sending of the telegram of August 22 from Jones, Sr., to his son, had practically all the merchantable pine on the Eastham lands estimated for the purpose of including it in their transaction. It failed to come up to expectations, and Mr. Wynne then offered to advance appellant $15,000 cash for the purchase of the Eastham timber, declining to pay more on the ground of its not being worth more, at the same time agreeing to also take appellant's own tract and include both in the deal with Ford. Gibbs and Wynne on this time contract were selling to Ford on a stumpage basis of $4 per 1,000 feet of actual cut, and the under-

standing between appellant and Mr. Wynne as affecting the Eastham timber was that whatever it might in fact bring in the general sale to Ford—in which appellant was not directly known, but only figured indirectly through his subsidiary sale to Wynne—over and above the $15,000 cash to be paid to Eastham, was to be equally divided between them. It therefore results that Jones, Sr., was putting his own timber in with Eastham's, that A. C. Ford of Houston in reality was the ultimate purchaser, and that under an actual estimate already made $15,000 was the best cash price it would bring.

[1] It is true Mr. Eastham seems to have labored under the impression that he was to get all his timber finally brought, but nothing in the telegram, the contract, the oral statements of J. B. Jones, Jr., nor elsewhere, furnishes justification for that assumption upon his part. At the trial below he further repeatedly gave as his reason for having refused to perform the contract that he had learned from overhearing one end of a telephone conversation between Messrs. Dean and Gibbs that appellant was not putting his own timber in with appellee's—a belief subsequently shown to have been entirely erroneous.

Moreover, whatever the nature of or the impressions proceeding from these statements of J. B. Jones, Jr., at the time the initial telegram from his father was handed by him to the appellee, they all become wholly immaterial, we think, when the latter afterwards, first about August 30th and next on September 4th, two weeks later, deliberately executed the contract in suit, agreeing in plain terms to sell the timber to the appellant himself for $15,000 cash. Previous impressions aside, he then knew—being admittedly uninfluenced by other oral representations from any one than those of Jones, Jr., at the date of the original telegram—just what he was getting, to whom he was selling, and what he was required to do. By the operation of familiar rules of law all prior oral representations and agreements touching any of these matters were merged into the written contract, that being an express and clear obligation of the appellee to sell and convey the timber upon the lands designated therein to the appellant for the price, upon the terms, and with the privileges set forth therein.

[2] The general rule as to the materiality of representations is thus laid down in Cyc. vol. 9, p. 425, h. (1):

"The misrepresentation must be material, that is, it must have been an inducement to the contract, otherwise it will not be a ground for avoiding it. It is not enough that it may have remotely or indirectly contributed to the transaction, or may have supplied a motive to the other party to enter into it. The representation must be the very ground on which the transaction has taken place. It may be stated as a rule that it is always material if, had it been known to be false, the contract would not have been entered into."

See, also, Farrar v. Churchill, 135 U. S. 609, 10 Sup. Ct. 771, 34 L. Ed. 246; Blythe v. Speake, 23 Tex. 429, 435.

[3] In the opinion of this court the case as made by the plaintiff below was not one resting on legal fraud.

After full development of the facts, no valid defense was interposed against the mutual obligations imposed by the contract upon its makers, performance of which in all particulars upon his own part was tendered by appellant. The trial court's judgment has accordingly been reversed, and decree has been here entered directing specific performance of the contract of sale in all respects as made by the parties to it.

Reversed and rendered.