STATEMENT BY THE COURT.
Lee Wacaster, appellant, was indicted, tried and convicted in the Garland Circuit Court for the crime of murder in the first degree for killing Tillman Brown, and his punishment fixed at life imprisonment in the penitentiary, and from this judgment prosecutes an appeal.
It appears from the testimony that there had been some previous trouble and fighting between the deceased, Tillman Brown, and threats made by him against *Page 984 
appellant, whose wife was Brown's stepsister; that, on the day of the killing, Brown and his wife had driven up to the front of Wacaster's house, and had been talking to Mrs. Wacaster for about twenty minutes when Wacaster came up from the rear in his car, stopped, and then started and drove off around the block, came back, and stopped his car behind Brown's and asked, as one witness said, "Tillman, who told you to come around here?" to which Brown replied, "I am in the street, ain't I, Lee?" Lee replied, "It don't make a damn bit of difference if you are, get out from here." Brown said, "It's a free street, and I don't intend to leave until I get ready." Wacaster then went into the house and called Mr. Floyd, a deputy sheriff, on the 'phone, and was heard to say, "There is a fellow out here in front of my place, and I have ordered him to leave, and he won't do it. What about it?" Witness then heard him say, "Well, if he don't leave, I will fix it so he will have to be carried out." Wacaster came out of the house, and said "Tillman, I said for you to leave," to which Brown replied, "I don't intend to leave. I didn't come up here for any trouble, but to talk to Florence" (Wacaster's wife). Mrs. Brown then said, "Let's go on," and Mrs. Wacaster said, "No. Don't go; he is just trying to pull one of his old bluffs." Wacaster told him to leave again, and Brown said, "I am in the street, and there is no son-of-a-bitch can make me move."
Wacaster then asked Mrs. Brown to get out, and told Tillman to leave again. Told Mrs. Brown to get out, for he would move him, if he didn't get out, with the car. He moved around inside the fence to where he could shoot without hitting her, and fired, and that's about all, as Mrs. Brown stated. She said her husband had one hand on the wheel and the other in his lap; that Brown was in his shirt-sleeves.
The deputy sheriff stated that Wacaster called him just before the trouble, Sunday afternoon, saying, "There was a man in front of his gate who refused to move," and wanted to know what to do about it. The *Page 985 
deputy replied, "Well, bring him on down." He didn't think there was any trouble. Wacaster said, "No, I don't want to have any trouble with him. The man is right in front of my gate." I said, "Well, you have a right to move him if he is on your property, but don't have any trouble." He replied, "Well, if he don't move, you will have to come and get him or me, or both of us." After a little the phone rang again, and Wacaster asked if we wanted him to come on down.
Other witnesses testified that they arrived on the scene while Brown's car was still standing, and that there was a bottle lying on the front seat under the steering wheel, and that the front wheels of the car were about four and a-half feet from the fence, with the back wheels a little further out in the street.
There was other testimony that Brown had said to a witness to whom he was talking when Wacaster passed, "There went a son-of-a-bitch I am going to get sooner or later." He said that Wacaster had been mistreating his wife. This witness repeated the threat to Wacaster.
Another, Miles Conway, stated that he had heard Brown say, on coming out of Wacaster's place of business some months before the killing, to Wacaster, "You son-of-a-bitch, I will kill you sooner or later." He was getting into his car at the time.
Another witness testified that, two or three years before, when he was at work for Wacaster, who had cut his hand, that Brown came and went into the house while witness was cleaning hogs in the yard, and came out with a gun in his hand, and said, "Lee is not here, but that's all right, I will kill the son-of-a-bitch sooner or later."
Two or three other witnesses testified about threats made by Brown against Wacaster. Brown said that if Lee Wacaster mistreated his wife he was going to kill him. Wacaster and his wife had had trouble.
Another witness heard Brown talking to Mrs. Wacaster on the 'phone, and heard Mrs. Wacaster say to him, "It is the same old thing over all the time, just fussing and raising hell all the time." *Page 986 
Defendant stated that he was not related to Brown. After he married, Tillman Brown's mother married Mrs. Wacaster's father; that he had trouble with Brown recently before the fatal encounter; that Brown had knocked him in the head when he came back from Colorado, with a piece of pipe he had thrown at him at the slaughter-house, because of the dispute over a right to use a slaughter-pen; that he had had trouble with him over at his, defendant's, blacksmith shop, when he had tried to make Brown stop fighting another man, and he jumped on him, swore that he would kill him, and went home after a gun. "About ten months before the killing he came to my slaughter-pen, and said, `I understand you have been mistreating Florence again.' I said, `No, I guess not.' He said, `You God damn son-of-a-bitch, I am going to kill you; you are going to stop it., And I said, `It looks like you would attend to your own business.' And he said, `I will get you, you son-of-a-bitch,' and he drove off when Mr. Conway came." He was then standing in the door of the slaughter-pen, with his right hand in his coat pocket. He later saw Brown on his front porch, talking with his wife, and when he drove up and saw that it was Brown, he drove on away. This was about a month before the killing. He didn't stop at that time because he had heard the threats Brown had made against him, and he didn't want any trouble. He had been told of Brown's threats by two or three different people; on the day of the killing, about three o'clock, he went by his house to get his saw and some orders. "Stopped when I saw Brown was there, and drove away around a block and a half, and returned in about ten minutes, driving slowly, thinking Brown would be gone before I got back." Said further: "I stopped my car, taking my gun off the seat and went into the yard and said, `Tillman, who sent for you?' And he said, `I am here.' I said, `Well, I don't want you out here now; you get up and go on away from my place.' He said, `I don't go nowhere; no son-of-a-bitch can't move me.' I said, `I will call a man and have him come and move you.' *Page 987 
He said: `You or no other son-of-a-bitch can't move me.' I went in and called the sheriff's office. I said: `Is this you, Floyd?' and he said it was. I said: `Floyd, there is a man out here at my place and he won't go away, I have had trouble with him.' He said: `Who is it?' I said, `Tillman Brown.' He said: `You go out there and tell him to move; you have a perfect right to move him.' I said, `I don't want to; I don't want any trouble.' He said, `You go out and tell him to move.' I went out and said, `Now, Tillman, go on away; I don't want you here.' Brown said: `I don't go nowhere; no son-of-a-bitch can move me.' How I said: `Go on, you and your wife move on away from my place; you are not wanted here.' He said: `You God damn son-of-a-bitch,' and grabbed with his right hand down in the seat, and I fired. I do not know from what position I fired. I do not know where I hit him. I did not get out of my car and tell him to move, and then go back and get my gun. I took my gun to protect myself from any attempt he might make against me, on account of the threats he had made. I saw something between him and his wife, and I thought it was a gun. It was on the seat between him and his wife. I did not change my position, nor did I say, `Move, woman.' I said for them to move. Mrs. Brown was never in the range of fire. It was never necessary for her to move. I shot him because I thought it was to shoot or be killed myself. I did not at that time intend to kill him. My wife and myself had been having trouble. My wife has had Tillman Brown to protect her. * * * I never at any time raised a difficulty with Tillman Brown. I have tried to stay out of trouble with him. I have avoided him, and have left my own home and have passed my own home when he would be there, and leave him there."
Denied on cross-examination that he had become violent in his own home within the last year, "but my wife and two of her sisters got a gun there, and she said if Brown didn't kill me she would." Stated that he had carried the shotgun for several years, ever since he had *Page 988 
been knocked in the head at the park. Denied that he had ever told any one that he was going to kill Brown, and said that he never went anywhere with the shotgun looking for it; that he had never attended a family reunion where Tillman Brown was, and had never had anything to do with him. After he talked with the deputy sheriff, he went out to tell him, Brown, to go, and "my intention was, if he didn't go, to go back and tell the sheriff, and when he made the break I thought that was my only chance. As the car was up next to my fence, I saw something in the seat, thought it was a gun, and when Brown said, `You son-of-a-bitch,' and grabbed down, I fired."
Marion Cook stated he heard the gun fire, and ran over, and Wacaster got in his car and said to him he was being imposed on, or couldn't be imposed on any longer. "I asked him what he did it for, and he said he was tired of being imposed on by him, and he couldn't stand it any longer."
The court instructed the jury, refusing to give appellant's requested instructions numbered B and F, which refusal was made grounds of the motion for a new trial as well as complaint of error, because the court, after the jury had retired, permitted the jury to take the written instructions in the jury room, and especially because the instructions on reasonable doubt and presumption of innocence had not been written and were not included therein.
Complaint was made, further, of the court having instructed the foreman of the jury out in the hallway, in front of the room where they were considering the case, in the absence of appellant and his counsel. The bill of exceptions also recites:
"On the 6th day of November, 1926, the court made the following further statement: `I will just make this statement then, that it was either at the time when the jury had requested the written instructions or I had gone to see as to whether or not they were making any progress toward a verdict; at any rate, I remember Mr. Kyle (the foreman of the jury) asked me something *Page 989 
about the likelihood of a parole in the case, and I told him that was a matter the jurors shouldn't consider at all in arriving at their verdict; that the likelihood of a parole was outside of their consideration of the case, and they shouldn't let that weigh with them at all, and I told him at that time to mention that fact to the jurors, that they shouldn't take into consideration the likelihood of pardon in the case at all, because it wasn't a matter for them to determine; just fix the punishment, whatever it was, or what they thought should be fixed." The court further said, "I don't think the defendant was there at the time, or his attorneys."
(after stating the facts). No error was committed by the trial court in refusing appellant's prayer for instructions numbered B and F, 4 and 23. Instructions B and F were argumentative, and, in effect, amounted to instructions upon the weight of the testimony telling the jury what importance should be attached to the evidence or lack of evidence, which this court has said should not be done. Bullard v. State,159 Ark. 435. Moreover, these instructions were fully covered by instructions numbered 16, 17, 18, 22 and 23, given by the court.
Instruction No. 4, refused, was likewise fully covered by instruction No. 20, correctly given by the court upon its own motion, and it was unnecessary to give more than one instruction of the law applicable to the particular facts. Housely v. State, 143 Ark. 425, 252 S.W. 584.
Neither was error committed in refusing to give requested instruction numbered 23, telling the jury "if any of the testimony in the case is susceptible of two constructions, one of guilt and one of innocence, then it is your duty to give it the construction of innocence." The court correctly instructed the jury on the law relating to weighing the testimony, the presumption of innocence and the question of reasonable doubt, and there was *Page 990 
no attempt to prove the guilt of defendant by inferences to be drawn from facts and circumstances established by the testimony. DeShazo v. State, 120 Ark. 494,179 S.W. 1012; Cooper v. State, 145 Ark. 403, 406,224 S.W. 226; Wawak and Vaught v. State, 170 Ark. 329, 279 S.W. 997.
Relative to the assignment that error was committed by the trial court in permitting the instructions, two oral instructions not transcribed, not included, sent to the jury room without the consent of appellant or his counsel, it will suffice to say that, since the case is to be reversed on another point or assignment of error, and remanded for a new trial, at which no such ground for objection is likely to occur, we do not find it necessary to pass upon it now.
This court has concluded, however, that error that calls for reversal of the judgment was committed by the trial court in his conversation with, or instruction to, the foreman of the jury in the hall outside of the jury room, and away from the presence of defendant and his attorneys. The court, in explanation of this incident as set out in the statement, said:
"I told him, in answer to his inquiry, that the likelihood of a parole was outside of their consideration of the case, and they should not let that weigh with them at all, and I told him at that time to mention that fact to the jurors, that they shouldn't take into consideration the likelihood of pardon in the case at all, because it wasn't a matter for them to determine. Just fix the punishment, whatever it was, or what they thought should be fixed."
Section 3192, Crawford Moses' Digest, provides how a jury, after it has retired for deliberation, shall acquire information on any point of law or about any part of the evidence, if there is disagreement, that they must require the officer to conduct them into court, where the information required must be given in the presence of, or after notice to, the counsel of the parties. Its provisions are mandatory. The jury might well have concluded *Page 991 
that this instruction was an expression of the court's opinion upon the weight of the testimony and the guilt or innocence of the defendant by his saying, "Just fix the punishment, whatever it was, or what they thought should be fixed."
In Wawak and Vaught v. State, 170 Ark. 329, the court said: "It is, of course, not only improper, but is error calling for the reversal of the judgment, for the court to communicate with the jury, in the absence of the defendant, any directions in regard to their verdict. Hinson v. State, 133 Ark. 149; Pearson v. State,119 Ark. 152." Neither could its harmful effect be relieved against by the testimony of the jurors, after the verdict was rendered, that they had already reached a verdict of guilty before the communication or instruction was received, since the jury had the right to consider or reconsider the question of guilt until the delivery of the verdict, and the jurors are not permitted to testify about such matters, anyway." Kindrix v. State, 138 Ark. 594,212 S.W. 84.
For the error designated the judgment must be reversed, and the cause remanded for a new trial. It is so ordered.